STEWART TAXI-SERVICE COMPANY *v.* MINNIE
M. SPENCER.

BALTIMORE STEAM PACKET COMPANY *v.* MIN-
NIE M. SPENCER.

*Connecting Carriers—Agency for Sale of Tickets—Liability for
Injuries—Taxicab Company as Carrier—Injury to
Passenger—Street Collision—Prayers
and Instructions.*

A steamboat company which sold to plaintiff a continuous ticket from Norfolk to Philadelphia, one coupon of which provided for transportation from the company's pier in Baltimore to a railroad station, was not liable to plaintiff for the negligence of the driver of a taxicab by which she was being transferred between those two points in Baltimore, the ticket expressly providing that in selling the ticket the company acted only as agent, and was not responsible beyond its own line, and there being no evidence of partnership or agency, or that the company contracted on its own behalf for through transportation over a connecting line.                         pp. 641, 642

A railroad company, in selling a ticket over its own and a connecting line, presumably acts as agent only for the latter, and assumes no liability for its negligence, in the absence of any evidence of a partnership arrangement, of a contract by the company selling the ticket for through transportation over the connecting line, or that the latter is the former's agent.
                                            p. 642

A ticket for a continuous passage is not necessarily a "through" ticket, but may merely indicate that there are no stop-over privileges.                         p. 642

A taxicab company is a common carrier.       p. 642

In an action against a taxicab company by one who, while riding in one of the company's taxicabs, was injured by a col-

lision with a private automobile at a street crossing, *held* that
the direction of a verdict for defendant, on the ground of lack
of evidence of negligence on its part, was properly refused.

p. 646

In such a case, it was proper to refuse defendant's prayer
that if, when the taxicab started to cross the intersecting street,
the private automobile with which the taxicab collided was at
a street a block away, it was not negligence for the driver to
proceed without further attention to such automobile, this being
a question for the jury.                                pp. 645, 646

It was also proper, in such a case, to refuse defendant's pray-
ers which ignored the testimony of the taxicab driver that, after
he reached the middle of the intersecting street or avenue, he
saw the private car sixty-five feet away, in the middle of the
further side of such street or avenue, and that he could then
have stopped the car within six feet, but that he did not try
to stop.                                                p. 646

*Decided January 14th, 1926.*

Appeals from the Superior Court of Baltimore City
(FRANK, J.).

Action by Minnie M. Spencer against the Baltimore
Steam Packet Company, the Stewart Taxi-Service Company
and J. F. Burton. From a judgment against all of said
defendants in the sum of $3,500, the two first named de-
fendants separately appeal. Reversed as to the Baltimore
Steam Packet Company and affirmed as to the Stewart Taxi-
Service Company.

The cause was argued before BOND, C. J., PATTISON,
URNER, ADKINS, OFFUTT, DIGGES, PARKE, and WALSH, JJ.

*Arthur L. Jackson,* for the Stewart Taxi-Service Company,
appellant.

*Watson E. Sherwood,* for the Baltimore Steam Packet
Company, appellant.

*William D. Macmillan,* with whom was *Harold Tschudi*
on the brief, for the appellee.

ADKINS, J., delivered the opinion of the Court.

In this case there are two appeals in one record.   The declaration is as follows:

"Minnie M. Spencer, plaintiff, by Harold Tschudi and William D. Macmillan, her attorneys, sues the Baltimore Steam Packet Company, a body corporate, the Stewart Taxi Service Company, a body corporate, and J. F. Burton.

"For that at the time of the happening of the accident hereinafter referred to the Baltimore Steam Packet Company, one of the defendants herein, was a common carrier for hire of passengers and as such owned and operated a transportation line; that on or about December 24, 1923, the plaintiff purchased from the said Baltimore Steam Packet Company a ticket for one continuous passage from Norfolk, Virginia, to Philadelphia, Pennsylvania, and that on that date the plaintiff became a passenger on said transportation line owned and operated by the said Baltimore Steam Packet Company whereupon it became the duty of this defendant to exercise the utmost care and diligence to avoid injury to the plaintiff herein during the said passage from Norfolk to Philadelphia; that when the plaintiff arrived at the wharf in Baltimore, to wit, on the morning of December 25th, 1923, this defendant, the Baltimore Steam Packet Company, carried out its aforesaid undertaking to provide transportation of the plaintiff from Norfolk to Philadelphia, and the plaintiff thereupon became a passenger in a taxicab owned by the Stewart Taxi Service Company, a body corporate, also one of the defendants herein, which defendant was then and is now engaged in the business of carrying persons, for hire, by means of taxicabs; that while the plaintiff herein was a passenger in said taxicab provided by the Baltimore Steam Packet Company and owned by the Stewart Taxi Service Company, and operated by their agent, it became the duty of these defendants to exercise the utmost care and diligence to avoid injury to the plaintiff herein while she was thus a passenger in said taxicab, which taxi-

cab was to carry this plaintiff from the wharf at Baltimore to Union Station, and all of which was in accordance with the undertaking of the Baltimore Steam Packet Company in providing transportation of the plaintiff from Norfolk to Philadelphia; that while the plaintiff was riding in said taxicab as a passenger, as aforesaid, *en route* to Union Station, a collision occurred between this taxicab and an automobile operated by J. F. Burton, also one of the defendants herein, which collision occurred at the corner of St. Paul Street and Mount Royal Avenue, a public highway of the State of Maryland, by reason of the wrongful and negligent acts on the part of the defendants herein, their agents and servants in the premises, in that the driver of said taxicab and the said J. F. Burton negligently, carelessly and unskillfully managed, operated and controlled the taxicab and automobile which they were driving, respectively, and that as a result of said collision the taxicab in which the plaintiff was riding was overturned and the plaintiff was violently thrown about the said cab as a result of which she sustained very serious and permanent injuries about her head, body and limbs and was caused to suffer and will continue to suffer great physical pain and mental anguish, all of which occurred through the negligence of the defendants herein, their agents and servants in the premises, in the operation, of said vehicles and without any negligence whatsoever on the part of the plaintiff thereunto contributing. "And the plaintiff claims Fifty Thousand Dollars ($50,000.00)."

The Baltimore Steam Packet Company, appellant in No. 97, demurred to the declaration, and the demurrer having been overruled, pleaded the general issue plea. The Stewart Taxi-Service Company, appellant in No. 96, also pleaded the general issue plea. The jury rendered a verdict against the said appellants and against another defendant, J. F. Burton. From the judgment on that verdict separate appeals were taken by the appellants. Burton did not appeal. The single bill of exception is to the ruling of the trial court on the prayers.

In the view we take of this case it will be unnecessary to pass on the Steam Packet Company's demurrer.

The evidence showed the purchase by appellee at the Steam Packet Company's office in Norfolk of a "continuous" ticket from Norfolk to Philadelphia in three coupons, as follows:

"PLAINTIFF'S EXHIBIT NO. 1.
Issued By
BALTIMORE STEAM PACKET Co. (OLD BAY LINE).

Non-Transferable Ticket
Sold Subject to Tariff Regulations
When Officially Stamped
GOOD FOR
ONE CONTINUOUS PASSAGE
to destination shown hereon, which must be reached not later than midnight of date punched in margin.

In selling this ticket and checking baggage hereon, this company acts only as agent and is not responsible beyond its own line.

R. L. JONES,
*General Passenger Agent.*

BALTIMORE, MD.

| Pennsylvania R. R. (Via Short Line) | If One-Half<br>*<br>Punch Here |
| --- | --- |

BALTIMORE
TO
PHILADELPHIA, PA.
(Destination)

| Form P-102 | Baggage<br>*<br>Punch Here |
| --- | --- |
| Via BSPCo. Tr P | |

On the face of said exhibit there had been punched "Dec. 26, 1923," and on the back of said Exhibit No. 1 the following was stamped:

Consolidated
Dec. 24-23
Ticket Office
Norfolk, Va. 9

## PLAINTIFF'S EXHIBIT NO. 2.

| | If One-Half<br>*<br>Punch Here |
|---|---|
| Transfer-Baltimore | |

One Passenger and Ordinary Baggage

From Baltimore Steam Packet Co.'s Pier

TO

Pennsylvania Railroad Station

| Form P-102 | Not Good If Detached |
|---|---|

| | Destination<br>Philadelphia, Pa. | |
|---|---|---|
| 8221 | Issued by<br>Baltimore Steam Packet Co.<br>Via BSPCo. Tr P | Baggage<br>*<br>Punch Here |

On the back of said Exhibit No. 2 the following was stamped:

Consolidated
Dec. 24-23
Ticket Office
Norfolk, Va. 9

---

## PLAINTIFF'S EXHIBIT NO. 3.

| | If One-Half<br>*<br>Punch Here |
|---|---|

Baltimore Steam Packet Co.

Station Stamped on Back

To

Baltimore

| Form P-102 | Not Good If Detached. |
|---|---|

Destination

PHILADELPHIA, PA.

| | Issued by<br>Baltimore Steam Packet Co.<br>Via BSPCo. Tr P | Baggage<br>*<br>Punch Here |
|---|---|---|
| 8221 | | |

On the back of said Exhibit No. 3 the following was stamped:

Consolidated
Dec. 24-23
Ticket Office
Norfolk, Va. 9

The evidence further shows:

That on arriving at the Steam Packet Company's wharf in Baltimore the porter carried the bags of appellee and several of her friends down the steps to a platform "and the man that calls out and gets you a cab he asked us where we were going and we told him we were going to the Pennsylvania Station and he said, 'Just a minute and I will get you a cab,' and he got us a cab and we got in and he took the ticket off" (the ticket referred to being the coupon marked Plaintiff's Exhibit No. 2, Exhibit 3 having been previously detached on the boat); that the man who approached her and got the cab for her was in uniform like the driver of the cab; **that the cab was a Stewart cab.**

The declaration alleges that the Stewart Taxi-Service Company is a body corporate; that it was engaged in the business of carrying passengers for hire by means of taxicabs, and that the cab in which plaintiff was riding was owned by the company and was operated by the agent of the company; and the evidence shows that the cabs regularly met the boat and transferred passengers to Union Station, having a regular employee at the wharf who acts as master; that the coupons collected by the drivers or starter are turned in at the office of the taxi-service company. There is not a particle of evidence that there was a contract between the Steam Packet Company and the appellee whereby said last-mentioned company assumed any obligation to her for her safe passage beyond its own line; on the contrary, the ticket itself expressly provides "that in selling this ticket and checking baggage hereon, this company acts only as agent and is not responsible beyond its own line." The words at the bottom of Exhibit No. 2, the transfer coupon, "Via B. S. P. Co. Tr. P." loses any special significance because the same words are at the bottom of each of the coupons or sections and apparently indicate that the route at its beginning is by way of the Steam Packet Company.

Nor is there any evidence of any partnership arrangement or a "single system," referred to in *Pugh v. Washington Ry. & Elec. Co.,* 134 Md. 196, and in 5 R. C. L. 155, sec. 780; or of a contract by the company on its own behalf for through transportation over a connecting line," referred to in *Mills v. B., C. & A. Rwy. Co.,* 111 Md. 260, and in 10 C. J. 820; nor that the taxicab company was an agent of the Steam Packet Company. It is to be noted that a ticket for continuous passage is not necessarily a "through" ticket, but may merely indicate that there are no stop over privileges. In the absence of any such contract or proof of agency or partnership, the law in this state is that a railroad company, in selling a ticket over its own and connecting roads, presumably acts as agent for the connecting roads, and assumes no liability for negligence of the connecting roads. *Mills v. B., C. & A. Ry. Co., supra,* and *Pugh v. Washington Ry. & Elec. Co., supra.* Especially is this true where liability is expressly negatived.

That the taxicab company was a common carrier was decided in *Goldsworthy v. Public Service Commission,* 141 Md. 674.

It follows that there was error in refusing the Steam Packet Company's fifth prayer, which asked for a directed verdict in its favor on the ground "that the ticket with coupons attached which plaintiff purchased of the defendant * * * *prima facie* constitutes an agreement between plaintiff and the defendant; whereby this defendant in selling said ticket acted only as agent and was not responsible to plaintiff beyond its own line, and there is no evidence that the Stewart Taxi-Service Company, which owned and operated the taxicab in which plaintiff was riding at the time the accident occurred, was the agent, servant or employee of this defendant." It will be unnecessary to consider the other rejected prayers of said company.

From now on we need consider only the appeal of the Taxi-Service Company. Plaintiff further testified that after getting in the cab at the wharf it "traveled real fast,

what I call usually fast"; that the chauffeur "never stopped before reaching Mt. Royal Avenue"; that on reaching said avenue "he was skimming along pretty fast, as I call it, and as he got kind of to the corner a car was coming to the left and he barely slowed up for this car to shoot by and then he stepped on the accelerator and the car started ahead and we were hit." Q. That was when you went into Mt. Royal Avenue A. If I remember right, the other car was just past and he was barely this side of the middle of the street and he shot on across and he was about in the middle of the street, but not quite.

One of the companions of appellee testified: "We started from the boat very fast * * *, and we kept a straight line to Union Station. I believe there is a little incline going down somewheres there, and we went very fast, seemingly so, and a few doors this side of Mt. Royal Avenue he kind of slackened, but did not stop, for a car coming from the left, and seemingly the man was giving it gas, because it shot across, started across, Mt. Royal Avenue. We did not get across Mt. Royal Avenue, because the man coming from the right of course hit us, or we came together in some way." Another occupant of the cab confirmed the previous witnesses as to the speed of the cab. "When the taxicab reached Mt. Royal Avenue the driver slowed up a little bit to let car on left go by and as it went by he stepped on the gas again and shot across the street."

A witness, Richard Gwinn, formerly city register, was in his bath room fronting on the south side of Mt. Royal Avenue about sixty or seventy-five feet east of St. Paul Street and saw the car driven by Burton an instant before the collision, when it was about seventy-five feet east of St. Paul Street. This witness felt so outraged at the terrific speed at which the Burton car was running that as a public duty he came forward as a voluntary witness in this case.

The driver of the cab in which appellee was riding testified that he was driving within the speed law, "around fifteen or eighteen miles an hour"; that at the intersection

of St. Paul Street and Mt. Royal Avenue "a car coming
to my left, eastbound, on Mt. Royal Avenue caused me to
stop, or practically stop, not stop, but slowed up enough
to drop a gear to start off again"; that he looked to his
right and saw the Burton car at Calvert Street and started
across, and had plenty of time to go across the street if the
Burton car had been coming at reasonable speed; that when
he got about the centre of the street he heard the tires of
that car dragging and he looked up and the car was on top
of him and in another second he was hit and turned over;
that he was at the building line on the south side of Mt.
Royal Avenue, when he saw the other car at Calvert Street;
that it is hard to judge the speed of a car at that distance,
"but naturally for the car to have hit me before it got across
the street it must have exceeded a few speed laws"; that it
is harder to judge the speed of a car coming towards one
than from the side; that he did not continue to look to his
right "for the simple reason I had plenty of time if the car
was going at the right rate of speed, I had plenty of time
to get across there"; that when he was half way across the
street he was running in second gear at five to eight miles
an hour; that at that rate he could have stopped his car
within the distance of six feet; that his brakes were good;
that he did not put on his brakes, as "I was not going to
stop in the middle of the street, and got struck right in the
front of your car, you might say. I tried to get ahead and
get out of the way, * * * stepped on the gas to go ahead;
* * * those cars are very slow to get away; I made
but little progress in doing it." Q. You could have brought
it to a stop in the middle of Mt. Royal Avenue? A. Yes,
I could have brought my car to a stop. Q. And if you had
done that what would have happened? A. He would have
hit me right where I was sitting, and we would all be killed
right there. Q. You only went the distance from the front
side to the back side when you were struck? A. That is
about all it was. He further testified that after he saw
the Burton car at Calvert Street he did not look again until

he was about the centre of Mt. Royal Avenue, when he heard the sound of the brakes and the Burton car was about sixty-five feet away on the north side of the avenue, about midway between the middle of the street and the north side; that there were no other automobiles passing at that time, and he saw no people there.

James F. Burton testified that he was going west on Mt. Royal Avenue about the middle of the right-hand side of the street and as he got to the corner the taxicab was coming north on St. Paul Street "and I looked to the right. Of course, the tracks were clear at the bridge and nothing to block them off, and coming up north all of a sudden something flashed right in front of me and I struck the taxicab right at the back door of the cab; he turned my car around facing north * * *; he dragged my car right around and his car turned to the side and turned over"; that he was traveling around eighteen to twenty-five miles an hour; that he would say the way the taxicab was coming by it was going fast; that there were no other cars there at that time.

There is a stipulation in the record that the distance from St. Paul Street to Calvert Street from curb to curb is three hundred feet, and that Mt. Royal at St. Paul is one hundred feet wide.

The Stewart Taxi-Service Company offered fourteen prayers, of which the ninth, tenth, twelfth, thirteenth and fourteenth were granted and the others were refused.

We find no error in the refusal of the rejected prayers.

The first three asked for a directed verdict in favor of the company, on the grounds respectively that there was no legally sufficient evidence to support a verdict; want of evidence of negligence on the part of said defendant constituting the direct and proximate cause of the accident; and uncontradicted evidence that the accident was caused solely by the negligence of Burton without any contributory negligence on the part of the said company or its chauffeur.

The sixth presented the proposition that if the driver of the taxicab slowed down to let an east-bound car on Mt.

Royal Avenue pass, and then looked to his right and saw the Burton automobile at Calvert Street, then it was not negligence for the chauffeur to proceed without further attention to said car, and the verdict must be for this defendant.

The eighth contained practically the same proposition, with the addition that under such circumstances Burton did not have the right of way over the taxicab within the meaning of the rules of the road of this state.

The eleventh asked for an instruction that if the jury should find that, when the taxicab started to cross Mt. Royal Avenue at St. Paul Street, the automobile driven by Burton was proceeding westerly and was at that time at Calvert Street, then there was no evidence of any negligence on the part of the company's chauffeur, and the verdict must be for this defendant.

To support its theory that the driver of the taxicab was justified in crossing Mt. Royal Avenue without further attention to the car which at the time of entering said avenue he saw at Calvert Street, one block away, this appellant cites a number of cases. But practically all of them are cases between parties respectively responsible for the colliding cars and not where a passenger in one of them is injured. Besides they hold with practical unanimity that the question of negligence was for the jury, and do not hold even under *their* facts that it should be decided as a matter of law, as the court was asked to do in this case.

Besides all of the said prayers ignore the testimony in regard to what happened after the taxicab reached the middle of the avenue and actually saw the Burton car approaching sixty-five feet away, when the driver of the car says he could have stopped within six feet, and when Burton's car was in the middle of the northern half of said avenue.

Any one who has driven a car must be conscious of the difficulty of making instantaneously a correct decision in such an emergency, and it is a question about which reason-

able men would differ.   But that makes it a question for the jury and not one to be decided as a matter of law.

The fourth, fifth and seventh prayers contain the propositions in varying forms that on the uncontradicted facts, or if the jury find certain facts, the Taxi-Service Company was transporting the plaintiff as the agent and servant of the Steam Packet Company and therefore there can be no verdict against the Taxi-Service Company, unless there is also a verdict against the Steam Packet Company.

What we have said in the earlier part of the opinion disposes of the contention.

The plaintiff's only granted prayer was the ordinary measure of damages prayer in such cases and it is stipulated in the record that the testimony of physicians as to the extent and nature of the injuries is omitted with the understanding that neither appellant disputes the nature and extent of appellee's injuries.

> *Judgment reversed without a new trial as to the Baltimore Steam Packet Company; and judgment affirmed as to the Stewart Taxi-Service Company; half of the costs to be paid by the Stewart Taxi-Service Company and half by appellee.*